IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| HAROLD RICHARDSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 12 C 9184 |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, Chicago Police | ) | |
| Detectives KENNETH BOUDREAU, | ) | |
| RICHARD PALADINO, JAMES CASSIDY, | ) | |
| THOMAS COUGHLIN, WILLIAM FOLEY, | ) | |
| FRANK VALADEZ and PAT | ) | |
| MCCAFFERTY, Chicago Police Sergeant L. | ) | |
| TULDIER, and as-yet Unknown Current or | ) | |
| Former City of Chicago Employees, | ) | JURY TRIAL DEMANDED |
| | | |
| Defendants. | | |

## COMPLAINT

NOW COMES Plaintiff, HAROLD RICHARDSON, by his attorneys LOEVY &

LOEVY, and complaining of Defendants CITY OF CHICAGO, Chicago Police Detectives

KENNETH BOUDREAU, RICHARD PALADINO, JAMES CASSIDY, THOMAS

COUGHLIN, WILLIAM FOLEY, FRANK VALADEZ and PAT MCCAFFERTY, Chicago

Police Sergeant L. TULDIER, and as-yet Unknown Current or Former City of Chicago

Employees, and states as follows:

### INTRODUCTION

1.      Plaintiff Harold Richardson spent nearly half of his life in prison for a crime he

did not commit.

2.      Harold was arrested at the age of sixteen for the brutal strangulation-murder and

rape of a woman named Nina Glover.  Ms. Glover's nude body was found in a dumpster,

wrapped in a sheet, on the morning of November 7, 1994.

3.     Harold was innocent, and had nothing to do with the crime.  No physical evidence connected him to the crime.  The sum total of the evidence against him was his false confession, which was coerced by Chicago police detectives with a long and notorious history of similar acts of misconduct.

4.     Although Harold and his four teenaged co-defendants all confessed to raping and murdering the victim, evidence available at the time of Harold's conviction, including DNA evidence, excluded him and each of his co-defendants as the perpetrators of the murder.

5.     The force of the Defendant Officers' misconduct was enough to overcome the DNA exclusions and secure convictions against Harold and three of his co-defendants.  Harold was wrongfully convicted and sentenced to spend the next 40 years of his life in prison.

6.     Recent DNA testing revealed that the rape and murder was committed by a single perpetrator named Johnny Douglas.  At the time of Ms. Glover's murder, Douglas was more than twice Harold's age, and was a convicted felon with a lengthy criminal history involving physical violence.  Remarkably, Douglas was at the crime scene on the morning that Ms. Glover's body was discovered, and was one of the first people the police interviewed.  Neither Harold nor any of his juvenile co-defendants (ranging in age from 15 to 18 years old) knew Douglas or had any association with him.

7.     Although Douglas was known to the police at the time Ms. Glover's body was discovered, the Defendant Officers instead focused their attention on framing Harold and his co-defendants.  Tragically, Douglas was allowed to remain free as a result and was later convicted of the strangulation-murder of a prostitute named Gytonne Marsh, charged with the strangulation-murder of another prostitute named Elaine Martin, and implicated in at least five other violent physical and sexual assaults of prostitutes between 1993 and 1997.

2

8.     Almost fifteen years after their convictions, Harold and his co-defendants were exonerated when DNA evidence confirmed that they were in fact innocent of the rape and murder.

9.     Sixteen years, eight months, and nine days after he was robbed of his freedom for a crime he did not commit, Harold Richardson walked out of prison a free man.  The State of Illinois granted Harold and each of his co-defendants a certificate of innocence on September 14, 2012.

10.     Just sixteen years old when he was arrested, Harold spent the most formative years of his life in maximum-security institutions, separated from his family and friends, robbed of the most basic of freedoms.  While incarcerated, Harold also lost his oldest brother, who he idolized and considered a second father; he was killed shortly after Harold's arrest, while bringing home money the family was going to use to pay for Harold's criminal defense attorney.  Plaintiff Harold Richardson files this civil rights action to bring the Defendants' misconduct to light, to ensure that they are held accountable for their actions, and to seek justice for the nearly seventeen years of his life that he lost for a crime the Defendants knew he did not commit.

## Jurisdiction and Venue

11.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

12.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

13.     Venue is proper under 28 U.S.C. § 1391(b).  The events giving rise to the claims asserted herein occurred in this judicial district and Defendant City of Chicago is a municipal corporation located here.

## The Parties

14.     Plaintiff Harold Richardson is 34 years old.  He lives with his mother in South Bend, Indiana.  At the time of the victim's murder, Harold lived with his family in the Englewood area of Chicago.  He was just 16 years old and enrolled at Thomas Kelly High School in Chicago, Illinois.

15.     At all relevant times, Defendants Kenneth Boudreau, Richard Paladino, James Cassidy, Thomas Coughlin, William Foley, Frank Valadez, and Pat McCafferty were detectives with the Chicago Police Department employed by Defendant City of Chicago and acting within the scope of their employment.

16.     At all relevant times, Defendant L. Tuldier was a sergeant with the Chicago Police Department employed by Defendant City of Chicago and acting within the scope of his employment.

17.     Defendants Boudreau, Paladino, Cassidy, Coughlin, Foley, Valadez, McCafferty, Tuldier, and as-yet Unknown Current or Former City of Chicago Employees are referred to collectively as the "Defendant Officers."

18.     The Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois.

## The Glover Murder

19.     At approximately 7 a.m. on November 7, 1994, Nina Glover's nude body was discovered in a dumpster behind the Family Super Mart Liquor Store at 1400 W. Garfield Boulevard.  Her body was wrapped in a blood-stained bedsheet, along with her clothing and shoes.  An autopsy revealed that Ms. Glover had been killed by strangulation.

20.     Defendant Cassidy and other Chicago Police Department personnel were assigned to investigate the crime.  When Defendant Cassidy arrived at the crime scene, four individuals identified themselves: the garbage truck driver who had discovered the body, an assistant manager for the liquor store, a neighborhood resident who lived around the corner, and Johnny Douglas.

21.     Douglas was a convicted felon with a lengthy and violent criminal history – between July 1980 and April 1998, Douglas was arrested 83 times and convicted of crimes 38 times.  Nor was this Douglas's first rape or assault.  His prior crimes included:

    a.  On March 5, 1993, over two years before killing Ms. Glover, Douglas paid Debra Gibson to have sex with him and then assaulted her, hitting her head with a rock.

    b.  On May 5, 1993, Douglas attempted to force Brena Hillie to have oral sex with him.  When she tried to escape, he beat her with a stick and cut her with broken glass.

    c.   On July 10, 1994, four months before killing Ms. Glover, Douglas met with a woman named Caprice Bramlett – in the exact same neighborhood he would later meet with Glover.  Douglas raped Ms. Bramlett twice, and choked her.  Douglas was convicted of aggravated sexual assault based on this incident and sentenced to six months in prison, but with good time credit served half that.

    d.  On October 21, 1994, shortly after his release from prison and just weeks before meeting Ms. Glover, Douglas attempted to rape a woman named Hazel Speight. He grabbed her and demanded she undress, but someone interrupted Douglas before he could complete the rape.

5

22.     Defendant Cassidy learned that Douglas lived nearly ten miles from the crime scene, and that he had no explanation for his presence in the alley on that early Monday morning.

23.     Douglas was an obvious prime suspect in the murder, and all of the information detailed above about Douglas's prior criminal history was known to Chicago law enforcement when they encountered him on the morning of November 7, 1994.  On information and belief, the Defendant Officers failed to run Douglas's background, which would have alerted them to his significant criminal history.

24.     After Defendant Officers failed to pursue Douglas at the time of Ms. Glover's murder, Douglas went on to terrorize many other women in Chicago. For example:

    a.  On June 17, 1995, a little over 6 months after killing Ms. Glover, Douglas raped and murdered Elaine Martin, along with her unborn child, while she was engaged in prostitution.  As he had done with Ms. Glover, Douglas strangled Ms. Martin and left her body in a public location.

    b.  On April 14, 1997, Douglas raped and strangled another woman: Gytonne Marsh. Like Ms. Glover and Ms. Martin, Ms. Marsh's body was found discarded in public, in a garage.  Douglas pled guilty to Ms. Marsh's murder many years later; he admitted to having sex with Ms. Marsh in exchange for cocaine, and choking her to death while they had sex.

    c.  On September 28, 1997, a few months after killing Ms. Marsh, Douglas raped Catie Oakes in his parents' garage.  His DNA was later recovered from her clothing.

25.     During the Cook County State's Attorney's prosecution of Douglas for one of these crimes, the prosecutors sought to introduce evidence of Douglas's "modus operandi,"

including physically assaulting and later strangling women after exchanging drugs for sex, and then abandoning their bodies in public locations. The prosecutors also pointed out that when Douglas was confronted with the charges that he had beaten and sexually assaulted by five separate women, he admitted doing so, but said that "nobody believed them because they were 'just whores.'"

26. Douglas's violence against women finally came to an end in 2008, when he was killed by Minosa Winters, who claimed self-defense. During the prosecution of Ms. Winters for Douglas's death, the State's Attorney's Office stipulated to Douglas's reputation in the community for violence, and that Douglas was "a major bully in the area who had violently attacked other people." Ms. Winters was acquitted.

27. Despite the mountain of evidence against Douglas, Defendant Officers investigating the Glover murder in November 1994 failed to link Douglas to Ms. Glover's death.

28. Instead, the investigation into Ms. Glover's murder came to a standstill. Until, four months later, they came across a learning-disabled teenager named Jerry Fincher.

**The False Cases Against The Teenagers**

29. On the night of March 7, 1995, the Defendant Officers approached Jerry Fincher and a friend who were standing on the street outside Jerry's home, a few blocks from the alley where Ms. Glover's body had been found. The Defendant Officers frisked Jerry and his friend, threatened to plant crack cocaine rocks on them, and asked them about Ms. Glover's murder.

30. Jerry honestly informed the Defendant Officers that he remembered a woman's body having been found in a nearby dumpster a few months back, and he told them that he and a friend had seen the police take the body away.

31.     This, apparently, was the break the Defendant Officers were looking for.  The Defendant Officers handcuffed Jerry, held him in their car at gunpoint, and took him to the Area One police station at 51st and Wentworth.

32.     Jerry was detained at the police station for nearly two days.  Despite telling the Defendant Officers that he knew nothing about the crime and was not in any way involved in it, he was kept in handcuffs, forced to spend two sleepless nights in interrogation rooms, and threatened with physical violence.  The Defendant Officers, including Defendant Valadez, fed him details of the crime and told him that he would go to prison for the murder unless he cooperated.  At one point, one of the Defendant Officers placed a phone book against his chest and pounded it with a flashlight, hurting the boy, and directed him to cooperate.  The Defendant Officers told him that if he cooperated, he could go home.

33.     Over the course of those two days, Jerry acquiesced.  He began to regurgitate the details that the Defendant Officers were telling him about the murder.

34.     The Defendant Officers described a false scenario where he, along with other neighborhood teenagers, had taken Ms. Glover to a basement at approximately 9 p.m. on November 6th, gang raped her, strangled her, and disposed of her body in the dumpster.  Over time, the Defendant Officers minimized his role in the murder, saying that they knew he had simply stood watch as the other teens raped and murdered her.

35.     The other teenagers the Defendant Officers implicated in the murder were Plaintiff, Vincent Thames, Terrill Swift, and Michael Saunders.  Each of these teenagers was innocent.  None of them was involved in any way with the murder.

36.     Due entirely to the Defendant Officers' coercion, Jerry agreed to their fabrications in a final recorded statement to Assistant State's Attorney ("ASA") Terrence Johnson on March 9, 1995.

37.     The Defendant Officers knew that Jerry's statement to ASA Johnson was coerced and false, and that it was simply a recitation of their fabrications.  Nevertheless, with Jerry's "confession" secured, the Defendant Officers set out to round up the rest of the teens in order to continue building their case.

38.     On March 9th, the Defendant Officers took Vincent Thames from his home and transported him to the police station, where he was handcuffed to the wall of an interrogation room.  Vincent was 18 years old and living at home at the time of the murder.  He had no experience with police interrogation.

39.     Defendants McCafferty, Cassidy and Paladino threatened that he would get natural life in prison unless he "confessed" to his involvement in Ms. Glover's murder.  He told the Defendant Officers that he did not know anything about the murder, and had nothing to do with the murder.

40.     Over the course of several hours, the Defendant Officers pursued various measures intended to coerce Vincent into falsely confessing.  Frightened by their threats, and believing the Defendant Officers' promises that they would release him if he went along with the Defendant Officers' story, Vincent succumbed to their pressure.

41.     Due entirely to the Defendant Officers' coercion, Vincent agreed to the Defendant Officers' fabrications in a final recorded statement on March 9, 1995, which implicated Plaintiff, Jerry Fincher, Terrill Swift, and Michael Saunders.

9

42.     Vincent Thames was innocent and had nothing to do with Ms. Glover's murder. He would not have falsely implicated himself but for the Defendant Officers' misconduct.

43.     The Defendant Officers next sought out Terrill Swift.  The Defendant Officers took seventeen-year old Terrill from his father's home and down to the police station, where they interrogated him for hours outside the presence of a parent, guardian, or attorney.  Terrill told the Defendant Officers that he did not know anything about the murder, and that he had nothing to do with the murder.  The Defendant Officers ignored his multiple requests that he be allowed to call his mother.

44.     The Defendant Officers, including Defendants Paladino and Boudreau, instead fed Terrill details of the Glover murder and repeatedly instructed him to implicate himself and the other teenagers in the crime.  They made false promises of leniency, repeatedly assuring Terrill that if he signed the confession they had concocted for him then he would be free to go home.  They also made it clear that if he did not confess, he would remain in their custody.

45.     As a result of hours of improper and undue pressure, inflicted on a teenager who had little experience with law enforcement, Terrill eventually falsely implicated himself, Plaintiff, Jerry Fincher, Vincent Thames, and Michael Saunders in an oral statement and in a court-reported statement.

46.     The Defendant Officers knew that Terrill's statement was coerced and false and merely a recitation of their fabrications.

47.     Terrill Swift was innocent and had nothing to do with Ms. Glover's murder.  He would not have falsely implicated himself in the crime but for the Defendant Officers' misconduct.

48.     The Defendant Officers then turned their attention to Plaintiff Harold Richardson. At the time of Ms. Glover's murder, Harold was 16 years old, lived with his parents, siblings, a nephew, and a great aunt, and was enrolled at Kelly High School.

49.     On the night of March 9, 1995, the Defendant Officers, including Defendants Foley and Boudreau, arrested Harold as he was walking home from a friend's house. The Defendant Officers told him, in sum and substance, that they had caught him in front of "the crime scene," and they threatened to take him to a nearby viaduct and kill him. Harold was terrified and did not know what was happening.

50.     Harold was taken to the police station, where the Defendant Officers, including Defendants Paladino, Cassidy and Coughlin, interrogated Harold outside the presence of a parent, guardian, or a youth officer. They handcuffed him to the wall of an interrogation room, fed him details of Ms. Glover's murder, and pressured him to implicate himself in the crime.

51.     Harold did not know Ms. Glover and he knew nothing about Ms. Glover's murder. He told this to the Defendant Officers.

52.     The Defendant Officers told Harold that they had evidence he was guilty. They told him that other teenagers had given confessions that squarely implicated him in the murder. Harold vaguely knew one of the teenagers they mentioned, Jerry Fincher, and was friendly with the other two, Terrill Swift and Vincent Thames. Harold again told the Defendant Officers that he did not know anything about the crime, or why those teenagers had named him as a participant.

53.     At some point, the Defendant Officers took Harold to a room with a two-way mirror, where he could see Vincent Thames. They left Harold in there briefly so that he could watch, but not hear, Vincent Thames giving what appeared to be a statement. They ultimately

took Harold back to the interrogation room, where they pressured him to confess. The Defendant Officers made false promises of leniency, assuring him that they would release him if he provided a statement.

54.     As a result of hours of improper and undue pressure, conducted outside the presence of his parents or an attorney, Harold eventually agreed to falsely confess to the Defendant Officers' account of the Glover murder. In an oral statement, he falsely implicated himself, Vincent Thames, Jerry Fincher, Terrill Swift, and Michael Saunders, as the Defendant Officers had instructed.

55.     Harold was innocent of the crime and had nothing to do with Ms. Glover's murder. He would not have falsely implicated himself but for the Defendant Officers' misconduct.

56.     The Defendant Officers knew that Harold's statement was coerced and false and merely a recitation of their fabrications.

57.     Harold ultimately refused to sign a written statement documenting his confession, knowing that it was untrue. Nevertheless, Harold was charged with first degree murder and aggravated sexual assault and taken to jail.

58.     Fifteen-year old Michael Saunders was the last to be arrested. The Defendant Officers located him, handcuffed him, and took him to the police station. There, the Defendant Officers interrogated him for hours, ignoring his requests for his mother and for an attorney.

59.     The Defendant Officers threatened Michael with physical harm, at one point ripping an earring out of his ear and threatening to take him to the railroad tracks behind the police station and shoot him.

60.     As a result of the hours of coercion and threats, Michael eventually signed a statement falsely implicating himself, Plaintiff, Vincent Thames, Terrill Swift, and Jerry Fincher. The statement was a fabrication, written entirely by Assistant State's Attorney Fabio Valentini. Michael signed the statement without reading it, believing that after doing so, he would be permitted to go home.

61.     The Defendant Officers knew that Michael's statement was coerced and false and merely a recitation of their fabrications.

62.     Michael Saunders was innocent and had nothing to do with Ms. Glover's murder. He would not have falsely implicated himself but for the Defendant Officers' misconduct.

63.     On the sole basis of the Defendant Officers' coercions, fabrications, and failure to disclose exculpatory evidence, each of the teenagers, including Plaintiff, was charged with first degree murder and aggravated sexual assault.

64.     The Defendant Officers deliberately fed the teenagers details of the Glover murder so that their "confessions" would appear reliable.  In particular, the Defendant Officers told Harold and the others that Ms. Glover was strangled to death; that she was a known drug user and prostitute; that when her body was found, she was naked and there was evidence suggesting she had been sexually assaulted; that she had lacerations and bruises on her face, suggesting that she had been hit with a sharp object and physically assaulted; and that she was found in a dumpster, wrapped in a white sheet with gold flowers.  Each of the teenagers included those details in their false "confessions."

65.     The Defendant Officers never disclosed their misconduct.  Furthermore, the Defendant Officers failed to document any of the teenagers' truthful exculpatory statements, and never revealed to anyone that any exculpatory statements had been made.

13

66.     Eight months after Harold's arrest, and before his bench trial, the Defendant Officers fabricated a police report concealing the coercion used to obtain Harold's and his co-defendants' false statements.

67.     During a pre-trial suppression hearing, Defendants Coughlin, Cassidy, Paladino, and Boudreau falsely testified about how Harold had confessed, and concealed their misconduct, coercion and fabrications.  On the basis of their perjured testimony, Harold's false confession was admitted as evidence against him at trial.  It was the only evidence tying him to the murder.

**Plaintiff's Wrongful Conviction**

68.     In November 1997, Harold Richardson stood trial for the rape and murder of Nina Glover.

69.     No physical evidence ever linked Harold to the crime.  In fact, DNA testing affirmatively excluded him as the perpetrator.  The prosecutors relied nearly singularly on Harold's false and coerced oral confession.

70.     As a proximate result of the above-described misconduct on the part of the Defendant Officers, Harold was convicted in a bench trial.  In explaining his ruling, Judge Sumner stated, "Obviously, the whole question comes down to the statement. … The fact of the matter [is] I believe the statement.  That's really all I need."

71.     When he found Harold guilty, Judge Sumner did not know that Harold's confession had been coerced by the Defendant Officers.  The Defendants who testified at Harold's pre-trial suppression hearing and at his trial, including Defendant Paladino, Defendant Cassidy, Defendant Boudreau, and Defendant Coughlin, did not admit that they had fabricated the confession.  Each of these Defendants took concerted steps to conceal the fact that Harold's confession was false and that it was the product of police coercion.

72.     Because the Defendant Officers concealed from the judge, the trial prosecutors, and Harold Richardson and his attorney that they had fabricated the confessions of Harold's co-defendants, Harold was unable to call the boys as witnesses who could testify that his confession, which alleged each of their participation in the crime, was fabricated and false.

73.     On January 27, 1998, Plaintiff was sentenced to 40 years in prison.

74.     But for the Defendants' misconduct, Plaintiff would have been neither prosecuted nor convicted.

### The Other Teenagers Are Wrongfully Convicted

75.     On the sole basis of their confessions, Terrill Swift and Michael Saunders were also convicted after bench trials.  Terrill was sentenced to 36 years in prison, and Michael to 40. In light of the outcomes of his co-defendants' trials, which all preceded his, Vincent Thames pled guilty and was sentenced to 30 years in prison.

76.     Jerry Fincher's "confession" was deemed to be illegally obtained and excluded following a suppression hearing.  Without any other evidence to convict him, the prosecutors dropped all charges against him.  Jerry Fincher was released in 1998 after having spent 3 ½ years in jail.

### Defendants' Pattern and Practice of Coercing False Confessions In Order to Secure Wrongful Convictions

77.     The Defendant Officers' misconduct in this case was not an isolated occurrence.

78.      Defendant Boudreau, for example, is one of the notorious homicide detectives who, under former Chicago Police Commander Jon Burge, had a lengthy history of physically and psychologically coercing suspects, including juveniles and teenagers, to "confess" to serious violent crimes, including murder.  Defendant Cassidy had a similarly notorious history of coercing and manufacturing confessions from juveniles as young as seven years old.

15

79.     These Defendants' methods went far beyond acceptable police interrogation techniques.  Indeed, in an examination of thousands of murder cases in Cook County from 1991 through 2000, the Chicago Tribune found that Boudreau and many of his colleagues had been involved in a wide range of cases that ultimately collapsed even though they had obtained confessions.

80.     According to the Tribune's survey, "Boudreau stands out not only for the number of his cases [with confessions] that have fallen apart, but for the reasons.  In those cases, Boudreau has been accused by defendants of punching, slapping or kicking them; interrogating a juvenile without a youth officer present; and of taking advantage of mentally retarded suspects and others with low IQs."

81.     In total, Boudreau managed to obtain murder confessions from more than a dozen people in which the charges were either dropped or the defendant was acquitted notwithstanding the supposed confessions.

82.     For a two-year period in the early 1990s, for example, Boudreau and his partner Halloran helped "solve" at least five murders with "confessions" that ended with acquittals. All of these suspects alleged that Boudreau and/or his partner mistreated them to obtain false confessions.

83.      Some examples of abuses perpetrated by Boudreau, often in cooperation with other Defendant Officers, include the following, all of which are corroborated by sworn testimony:

> a.  Derrick Flewellen signed a confession coerced by Boudreau after being
>     interrogated for more than 36 hours, during which time he was slapped, kicked,
>     punched, and slammed into the wall by Boudreau and other detectives before

16

succumbing to their coercion.  After spending almost five years in prison, Flewellen was acquitted of the two murders when DNA tests proved the crime was committed by someone else.

b.  Boudreau obtained a murder confession from Alfonzia Neal, testifying that Neal waived his rights and signed a statement handwritten by a prosecutor.  Experts established that Neal had an IQ in the 40s, well below the dividing line for mental retardation, and that he was incapable of intelligently waiving his Miranda rights. Neal was acquitted notwithstanding his signed confession.

c.  In December 1993, Boudreau and another detective "solved" two separate murders with confessions from two mentally retarded juveniles, Fred Ewing and Darnell Stokes, classmates in special-education courses.  One expert concluded that Ewing "was unable to comprehend the substance of the confession which he allegedly made."  Absent any other evidence connecting them to the crime, both were acquitted despite the confessions obtained by Boudreau.

d.  In 1998, Boudreau helped get a murder confession from a 13-year-old boy with a verbal IQ of 59.  The judge later ruled that the boy did not have the mental capacity to waive his rights and threw out the confession.  Prosecutors then dropped the charges.

e.  After police officer Michael Ceriale was shot to death in 1998, Boudreau and other detectives arrested Jonathan Tolliver at 4:00 a.m. and interrogated him for a 24-hour period, resulting in allegedly incriminating (unwritten and unsigned) statements.  Tolliver was never advised of his rights, no Miranda waiver was created, and his requests to speak with a lawyer and/or his mother were refused.

17

Boudreau claimed that the protections for minors were not utilized because Tolliver, who was 16 years old, had lied about his age, falsely claiming to have been eighteen.  After two trials, Tolliver was convicted of Ceriale's murder.

f.   In connection with the Ceriale murder, Boudreau, among others, coerced statements from other witnesses to incriminate Tolliver.  The means of coercion included an intentional withholding of insulin from one diabetic witness for more than 24 hours.  When these witnesses later refused to testify at trial consistent with the false statements coerced by Boudreau, the State charged five of them with perjury, and at least one of them went to jail for it.

g.   Marcus Wiggins brought a lawsuit against Boudreau alleging that he was handcuffed to a wall and beaten in an interrogation room while being questioned with a group of youngsters in a 1991 murder case.  Wiggins' mother had been denied access to her son, who was a 13-year old 8th grader at time of the coerced confession.  Six young suspects gave confessions.  Two of these confessions were later thrown out on the basis of the "periodic screaming [at the police station] throughout the night," screaming that Boudreau testified he did not hear.  The remaining four were acquitted, including two who had been interrogated by Boudreau.

h.  Antoine Word was placed in an interrogation room by Boudreau, where he was cuffed to a bench for prolonged periods, unable to use the bathroom (he urinated on the floor), and beaten.  Boudreau told Word that other witnesses had placed him at the scene of a murder, but that he would let him go home if he signed a statement saying that he gave another man a gun.  After almost 48 hours in the

interrogation room, Word signed the statement written out by Boudreau, and was convicted of murder.

i.   Fabian Pico was 16 years old when he gave a self-incriminating statement to Defendant Boudreau which was then used to convict him of murder. When Pico moved to suppress the statement on the grounds that the police did not allow him access to his mother, Boudreau claimed that he had tried unsuccessfully to reach Pico's mother by phone before Pico confessed, but this supposed attempted contact is not referenced anywhere in his written reports.

j.   After being beaten by Defendant Boudreau, Jesse Clemon signed a written statement with his left hand (because his right hand had been injured). Witnesses in the station heard hollering and protests of "I didn't do it." Boudreau testified that the statement was not coerced, but the judge suppressed it anyway due to the "horrendously oppressive" atmosphere at the station.

k.   Kilroy Watkins was arrested and handcuffed to a metal ring in an interrogation room by Boudreau, who then choked and punched him in order to get him to confess to a six-month old shooting. After more than 30 hours in this room with minimal sleep and food, Watkins signed an incriminating statement.

l.   In 1992, Clayborn Smith was interrogated for 37 hours about a murder he knew nothing about. When Mr. Smith professed his innocence, another detective kicked and punched his head and body, and Boudreau threatened to charge Mr. Smith's pregnant girlfriend if he did not confess. At one point, the detectives believed that they had successfully coerced Mr. Smith to confess, but when the Assistant State's Attorney ("ASA") entered the room, Mr. Smith continued to assert his

19

innocence, whereupon the ASA left and the beating resumed. The same thing happened a second time, this time with another ASA, but again Mr. Smith refused to confess. When that ASA left the room, Boudreau and his partner resumed the beating, whereupon Mr. Smith, badly beaten and deprived of both counsel and sleep for an inordinate time, finally signed a false confession.

m. Christopher Holly filed a federal civil rights lawsuit against Boudreau and other detectives alleging that he was framed for a murder in 1998.

n. Richard Malek alleges that Boudreau and other detectives kept him in an interrogation room for four days, depriving him of sleep, food, and access to lawyers, and that they also used violence (they knocked out his tooth) and threats to shoot him (Russian Roulette) in an attempt to coerce his confession. Boudreau participated in this coercion, but played the "good cop," uncuffing Mr. Malek and providing him with a McDonalds hamburger after he had been starved for an extended period of time. When they falsely claimed to have obtained an "oral" confession, Mr. Malek filed a federal lawsuit against Boudreau and others.

o. In 1995, Detective Boudreau and his partner interrogated and coerced confessions from Oscar Gomez, Eric Gomez, and Abel Quinoles. Their tactics included holding all three men for 30 hours, beating them while they were shackled to the wall, and preventing them from communicating with an attorney or their families, all in a successful attempt to coerce false confessions. All three defendants were found not guilty, based largely on the conclusion that the detectives, including Boudreau, physically coerced their confessions.

p.  In 1993, the day after Tyrone Reyna's sixteenth birthday, he was beaten during an interrogation by Boudreau and his partner, who refused to let him contact his family and intimidated him into confessing to a murder he did not commit. Tyrone Reyna's co-defendants, Nicholas Escamilla and Miguel Morales, were arrested by Boudreau for murder despite the lack of any physical evidence or eye witnesses linking Escamilla to the crime. Boudreau tortured Escamilla by beating him and threatening to send his pregnant wife to jail if he did not confess. After many hours of abuse, Escamilla eventually falsely confessed as well. Miguel Morales was also beaten during his interrogation. However, unlike Escamilla, Morales refused to confess. Boudreau then coerced a friend of Morales into stating that Morales had confessed to the murder over the phone. The witness recanted his statement at trial, and testified that he only gave the statement after he had been beaten for over twenty hours and threatened with prosecution until he falsely implicated Morales.

q.  In 1998, Boudreau and his partner held Joseph Jackson in an interrogation room in connection with a murder. When Jackson refused to confess, Boudreau placed a book on his chest and stomach and hit the book with a black jack, so as not to leave visible marks on Jackson's body. Meanwhile, Boudreau's partner, using a torture technique referred to in the Department as "bagging," placed a typewriter cover over Jackson's head and cut off his air supply. As a result of this coercion, Jackson eventually confessed to a murder he did not commit.

r.  In 1991, fifteen year-old John Plummer was interrogated for 36 hours by Detective Boudreau and his partner. After being physically beaten, he falsely confessed to a murder.

s.  In 1992, Arnold Day was interrogated in connection with a murder investigation. Mr. Day was isolated in an interrogation room for many hours while Detective Boudreau psychologically and physically tortured him until he finally confessed.

t.  In 1993, Richard Anthony was forced to confess to murder by Detective Boudreau's partner, who beat Anthony and denied him food, sleep, and use of the restroom in order to coerce Anthony into giving a false statement.  Richard Anthony's co-defendant, Jerry Gillespie, was also beaten by Boudreau his partner during his 30 hour interrogation, which included preventing him from contacting an attorney or his family and refusing to allow him to use the bathroom.  As a result of the abuse, coercion and intimidation, Gillespie eventually gave a false confession.

u.  In 1995, Boudreau was part of a team of detectives who physically abused John Wright until he agreed to implicate Malik Taylor and Michael Taylor in connection with a murder.

v.  In 1993, Emmett White was arrested by Boudreau and another detective, who hit him in the face, punched him in the body, threw him to the ground and stepped on his face, dragging his head across the floor of the interrogation room, all in an attempt to get him to falsely confess.  Photographs of Mr. White corroborated his testimony of his abuse.

84.    In addition to the above examples involving Defendant Boudreau, there are many

other examples of similar misconduct by the Defendant Officers.  For example:

a.    In 1987, Defendant Foley worked with other Chicago detectives to obtain a false

   confession from Frank Bounds to murder.  The detectives hit Bounds on the head

   and threatened to implicate Bounds's girlfriend in the murder if he did not

   confess.

b.    In 1994, Detective Cassidy forced an 11 year old boy A.M. to confess to

   murdering an 83 year old woman.  The boy was unlawfully detained in the police

   station and interrogated outside the presence of his parents or a youth officer.

   Although A.M. was wrongly convicted on the basis of this confession, his

   confession was ultimately suppressed and the adjudication was later expunged.

c.    In 1997, Chicago police officers, including Defendant Cassidy, forced 13 year old

   Jimie Haynes to confess to murder after being held in the station for more than 14

   hours without a guardian or youth officer.  Prosecutors eventually dropped the

   charges after the confession was suppressed.

d.    In 1998, Defendant Cassidy forced two other young boys, aged 7 and 8, to falsely

   confess to the murder of an 11 year old boy.  The two boys were later exonerated

   when forensic testing revealed that a 30 year old man, Floyd Durr, had left semen

   on the victim's underwear and was the true perpetrator.

e.    In November 1998, Chicago police officers, including Defendant Cassidy,

   coerced Steven Hudson into falsely confessing to a murder by beating him,

   shocking him, and threatening to arrest his girlfriend and take his son away if he

did not confess. The statement was eventually suppressed and, as no other evidence implicated Hudson in the murder, the charges dismissed.

    f.    In 1997, Defendant Coughlin obtained a false confession from Robert Wilson for attempted murder. Wilson was held in police custody for an extended period of time, physically abused, denied sleep, food and medication, intimidated, and promised leniency if he confessed.

    g.    In March 1997, Defendant Coughlin coerced another false murder confession from 15 year old Eric Kittler. Kittler was held for 12 hours, deprived of food and sleep, threatened with physical harm, and told he could go home once he confessed. His mother was not allowed into the interrogation room until he was about to sign the statement. Kittler was ultimately acquitted and settled a civil rights suit for $2 million.

85.    Part and parcel with this history of fostering egregious misconduct, the Chicago Police Department has a long history of using physically and psychologically coercive interrogation tactics in order to elicit statements from suspects in criminal cases, which has caused false confessions and led to wrongful convictions.

86.    The wrongful convictions of innocent persons who gave coerced and false confessions include numerous cases in which Chicago Police Detectives used the very same tactics that the Defendants employed against Plaintiff in this case. These tactics include: (a) psychological intimidation and manipulation; (b) the use of clearly unreliable or coerced informants; (c) the fabrication of confessions; (d) the misleading of parents and denial of parents' access to their children during interrogations; (e) the denial of access to counsel; (f) the concealment of exculpatory information; (g) false promises of leniency in exchange for

24

"cooperation" in the form of a confession; and (h) the use of other unlawful tactics to secure the arrest, prosecution, and conviction of persons, including juveniles and teenagers, without regard to their actual guilt.

87.     At the time of the events leading to Plaintiff's coerced confession and wrongful conviction, members of the Chicago Police Department systematically promoted the malicious prosecution of teenagers and other vulnerable individuals by using abusive and coercive interrogation tactics to force them to confess to crimes they did not commit.  Youth are inherently more suggestible, they are vulnerable to manipulation, and they frequently lack the ability to fully understand—let alone assert—their rights during an interrogation.

88.     As a matter of widespread custom and practice, Chicago Police Department Detectives, including but not limited to the Defendants, exploited the vulnerability and suggestibility of the youth in their custody in order to obtain false confessions and close cases. Detectives systematically denied juvenile and teenage suspects access to their parents and to counsel, fed them details of the crime, made false promises of leniency, and generally subjected these teenagers to immense physical and mental pressure until they "confessed."

89.     Consistent with the municipal policy and practice described in the preceding paragraph, members of the Chicago Police Department, including but not limited to the Defendants, systematically suppressed evidence pertaining to these fabricated and coerced confessions, both from the Cook County State's Attorney's Office and from criminal defendants, whose co-defendants' coerced confessions were introduced against them at trial.

90.     As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department.  In

accordance with this code, Chicago Police Detectives refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

91.     As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct; failing to investigate cases in which the police are implicated in obtaining coerced and false confessions, as well as wrongful charges and convictions; failing to discipline officers accused of this unlawful conduct; and facilitating a code of silence within the Chicago Police Department, Chicago police officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences.  As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens, including the youngest and most vulnerable members of society.

92.     The City's failure to train, supervise, and discipline its officers effectively condones, ratifies, and sanctions the kind of misconduct that the Defendant Officers committed against Plaintiff in this case.  Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the City's practices and de facto policies, as alleged above.

93.     The City of Chicago and officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct.  They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

26

94.     The policies and practices described in the foregoing paragraphs were consciously approved by City of Chicago policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

**Plaintiff's Exoneration**

95.     Throughout his prosecution and incarceration, Harold Richardson maintained his innocence and pursued all possible avenues to prove it.

96.     In February 24, 2011, Harold joined Terrill Swift and Michael Saunders in filing a motion for post-conviction DNA testing.

97.     Cellmark Laboratories in Dallas, Texas conducted the DNA testing and obtained a single male DNA profile from the vaginal swab extracts collected from Ms. Glover post-mortem.

98.     Despite the "confessions" claiming that four of the co-defendants had intercourse with the victim, the testing revealed that only one person had left DNA in the victim.  That person, as everyone knew, was not Harold or any of his co-defendants.

99.     On May 13, 2011, the Illinois State Police submitted the DNA profile to the Combined DNA Index System (CODIS) database, which returned a match to the DNA profile of Johnny Douglas, the convicted felon who was inexplicably present when the body was found in the early morning hours of November 7, 1994.

100.     On May 29, 2011, Harold Richardson and his co-defendants filed a joint petition to vacate their convictions.  The Circuit Court of Cook County granted the joint petition on November 16, 2011.  Shortly thereafter, the Cook County State's Attorney's Office stated they would *nolle prosequi* future charges.

101.     On September 14, 2012, the State of Illinois granted Harold Richardson a certificate of innocence.

**Plaintiff's Damages**

102.     Harold Richardson spent more than 16 ½ years in prison for a crime he did not commit.  He must now attempt to make a life for himself outside of prison without the benefit of nearly two decades of life experiences—including his adolescence and young adulthood—which normally equip adults for that task.

103.     Additionally, the emotional pain and suffering caused by losing these formative years has been substantial.  Harold was taken from his family when he was just 16 years old.  During his incarceration, he was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right.  He missed out on the ability to graduate from high school with his friends, to share holidays, births, funerals, and other life events with loved ones, the opportunity to have girlfriends, to fall in love, to marry, and to pursue a career, and the fundamental freedom to live one's life as an autonomous human being.  Several relatives died while he was incarcerated, including, most painfully, his oldest brother.  Harold was denied the opportunity to attend their funerals, and continues to struggle to find a means to grieve.

104.     As a result of the foregoing, Harold Richardson has suffered tremendous damage, including but not limited to physical harm, mental suffering, and loss of a normal life, all proximately caused by Defendants' misconduct.

**Count I – 42 U.S.C. § 1983**
**Fifth Amendment**

105.     Each paragraph of this Complaint is incorporated as if restated fully herein.

106.     In the manner described more fully above, the Defendant Officers, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of

their employment, forced Plaintiff to incriminate himself falsely and against his will, in violation of his rights secured by the Fifth and Fourteenth Amendments.

107.    As described more fully above, the Defendant Officers conducted an unconstitutional interrogation of Plaintiff, which caused Plaintiff to make involuntary statements implicating himself in the rape and murder of Nina Glover.

108.    The false statements written and coerced by the Defendant Officers and attributed to Plaintiff were used against Plaintiff to his detriment in a criminal case.  These statements were the only reason that Plaintiff was prosecuted and convicted of the murder of Ms. Glover.

109.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

110.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress.

### Count II – 42 U.S.C. § 1983
### Violation of Due Process

111.    Each paragraph of this Complaint is incorporated as if restated fully herein.

112.    As described more fully above, all of the Defendant Officers, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

113.    In the manner described more fully above, the Defendant Officers individually, jointly, and/or in concert and in conspiracy, fabricated false reports and other evidence which caused the conviction of Plaintiff; this includes fabricating that the nonpublic information about the crime had originated with Plaintiff's co-defendants, when it had actually been fed to them by the Defendant Officers.

114.    In the manner described more fully above, the Defendant Officers individually, jointly, and/or in concert and in conspiracy, deliberately withheld exculpatory and impeachment evidence, such as the co-defendants' truthful exculpatory statements, and the Defendant Officers' coercion that resulted in the co-defendants' fabricated confessions.  By failing to disclose this information, the Defendant Officers violated their clearly established duty to report all material exculpatory and impeachment information to prosecutors.

115.    Absent Defendants' misconduct, the prosecution of Plaintiff could not and would not have been pursued, and Plaintiff would not have been convicted.

116.    The Defendant Officers' misconduct directly and proximately resulted in the unjust and wrongful criminal conviction of Plaintiff and his continuing wrongful imprisonment, thereby denying him his constitutional right to a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

117.    As a direct and proximate result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress.

118.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

**Count III – 42 U.S.C. § 1983**
**Failure to Intervene**

119.    Each paragraph of this Complaint is incorporated as if restated fully herein.

120.    In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, one or more of the Defendant Officers stood by

without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

121.     As a direct and proximate result of the Defendant Officers' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

122.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

### Count IV – 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

123.     Each paragraph of this Complaint is incorporated as if restated fully herein.

124.     After the murder of Ms. Glover, the Defendant Officers, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his constitutional rights, including his rights to due process and to a fair trial, all as described in the various paragraphs of this Complaint.

125.     Additionally, before and after Plaintiff's conviction, the Defendant Officers further conspired to deprive Plaintiff of exculpatory information to which he was lawfully entitled and which would have led to either his not being charged, his acquittal, or his more timely exoneration.

126.     In this manner, the Defendant Officers, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

127.   In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above—such as fabricating evidence, withholding exculpatory evidence, coercing false confessions, committing perjury during hearing and trials—and was an otherwise willful participant in joint activity.

128.   As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Plaintiff's rights were violated, and he suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress.

129.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's rights.

### Count V – 42 U.S.C. § 1983
### Supervisory Liability

130.   Each paragraph of this Complaint is incorporated as if restated fully herein.

131.   The unfair trial, wrongful conviction, and continued wrongful detention of Plaintiff were caused by the deliberate indifference and recklessness of supervisory defendants, including but not limited to Defendant Tuldier, when they failed to adequately train and supervise the individual Defendant Officers.

132.   Specifically, these supervisory defendants were personally involved in the case against Plaintiff and knew or, in the absence of their deliberate indifference and recklessness, should have known of their subordinates' unconstitutional actions and related misconduct in the case.

133.   Furthermore, these supervisory defendants failed to supervise the individual defendants in constitutionally adequate law enforcement practices, particularly those which concerned interviews of suspects and the production of exculpatory evidence, thereby

encouraging and/or permitting these defendants and other employees to coerce and fabricate false inculpatory evidence and to withhold exculpatory and impeachment evidence, which caused the constitutional deprivations suffered by Plaintiff.

134.    These interview techniques, failures to produce exculpatory evidence, fabrications and other investigative procedures were contrary to accepted methods used by law enforcement agencies.  The fact that the defendant supervisors failed to train and supervise their subordinates to ensure that they employed proper investigation procedures demonstrates deliberate indifference and reckless disregard for Plaintiff's constitutional rights.

135.    The personal involvement of the defendant supervisors, through their actions and omissions, proximately and directly caused the constitutional deprivations and grievous personal injuries suffered by Plaintiff, including the above-mentioned injuries and damages.

136.    The misconduct described in this Count was objectively unreasonable, and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's clearly established constitutional rights.

### Count VI – 42 U.S.C. § 1983
### *Monell* Policy Claim

137.    Each paragraph of this Complaint is incorporated as if restated fully herein.

138.    The actions of all the individual Defendant Officers were undertaken pursuant to policies and practices of the Chicago Police Department, described above, which were ratified by policymakers for the City of Chicago with final policymaking authority.  These policies and practices included the failure to adequately train, supervise, and discipline officers who engaged in the alleged constitutional violations, as set forth in greater detail above.

139.     The policies and practices described in this Count were maintained and implemented by the City of Chicago with deliberate indifference to Plaintiff's constitutional rights.

140.     As a direct and proximate result of the City's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

141.     The City of Chicago is therefore liable for the misconduct committed by the Defendant Officers.

**Count VII – State Law Claim**
**Malicious Prosecution**

142.     Each paragraph of this Complaint is incorporated as if restated fully herein.

143.     The Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

144.     The Defendant Officers caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause.  These judicial proceedings were instituted and continued maliciously, resulting in injury.

145.     Statements of the Defendant Officers regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and perjured.  The Defendant Officers also fabricated evidence by coercing false inculpatory testimony from co-defendants.  The Defendant Officers were aware that, as described more fully above, no true or reliable evidence implicated Plaintiff in the Glover strangulation-murder, all inculpatory evidence was coerced and fabricated, and forensic evidence indicated Plaintiff's innocence.  Furthermore, the Defendant Officers intentionally withheld from and misrepresented to prosecutors facts that further vitiated probable cause against Plaintiff, as set forth above, and failed to investigate evidence which

would have led to the actual perpetrator. The Defendant Officers withheld the facts of their manipulation and the resulting fabrications from Plaintiff.

146.    The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

147.    Plaintiff's conviction was vacated on November 16, 2011, and the prosecution terminated in Plaintiff's favor on January 17, 2012, when the Cook County State's Attorney's Office agreed to *nolle prosequi* future charges. On September 14, 2012, Plaintiff was granted a Certificate of Innocence by the State of Illinois.

148.    As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries as set forth above, including pain and suffering.

**Count VIII – State Law Claim**
**Intentional Infliction of Emotional Distress**

149.    Each paragraph of this Complaint is incorporated as if restated fully herein.

150.    The acts and conduct of the Defendant Officers as set forth above were extreme and outrageous. The Defendant Officers' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

151.    As a direct and proximate result of the Defendant Officers' actions, Plaintiff suffered and continues to suffer severe emotional distress.

**Count IX – State Law Claim**
**Civil Conspiracy**

152.    Each paragraph of this Complaint is incorporated as if restated fully herein.

153.    As described more fully in the preceding paragraphs, the Defendant Officers, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

154.    In furtherance of the conspiracy, the Defendant Officers committed overt acts and were otherwise willful participants in joint activity including but not limited to the malicious prosecution of Plaintiff and the intentional infliction of emotional distress upon him.

155.    The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

156.    As a direct and proximate result of the Defendant Officers' conspiracy, Plaintiff suffered damages, including severe emotional distress and anguish, as is more fully alleged above.

## Count X – State Law Claim
## Respondeat Superior

157.    Each paragraph of this Complaint is incorporated as if restated fully herein.

158.    In committing the acts alleged in the preceding paragraphs, each of the Defendant Officers were members of, and agents of, the Chicago Police Department, acting at all relevant times within the scope of their employment and under color of law.

159.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

## Count XI – State Law Claim
## Indemnification

160.    Each paragraph of this Complaint is incorporated as if restated fully herein.

161.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

162.     The Defendant Officers are or were employees of the Chicago Police Department, who acted within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff, HAROLD RICHARDSON, respectfully requests that this Court enter judgment in his favor and against Defendants, CITY OF CHICAGO, Chicago Police Department Detectives KENNETH BOUDREAU, RICHARD PALADINO, JAMES CASSIDY, THOMAS COUGHLIN, WILLIAM FOLEY, FRANK VALADEZ and PAT MCCAFFERTY, Chicago Police Sergeant L. TULDIER, and as-yet unknown City of Chicago Employees, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

**JURY DEMAND**

Plaintiff, HAROLD RICHARDSON, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/ Rachel Steinback
One of Plaintiff's Attorneys

Arthur Loevy
Jon Loevy
Russell Ainsworth
Tara Thompson
Rachel Steinback
LOEVY & LOEVY
312 N. May St., Ste. 100
Chicago, IL 60607
(312) 243-5900