# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| MICHAEL SAUNDERS, | Case No. 12-cv-9158 |
| Plaintiff, | |
| v. | Judge Robert M. Dow, Jr. |
| | Magistrate Judge Sheila Finnegan |
| CITY OF CHICAGO, et al., | |
| Defendants. | |

| | |
|---|---|
| VINCENT THAMES, | Case No. 12-cv-9170 |
| Plaintiff, | |
| v. | Judge Robert M. Dow, Jr. |
| | Magistrate Judge Sheila Finnegan |
| CITY OF CHICAGO, et al., | |
| Defendants. | |

| | |
|---|---|
| HAROLD RICHARDSON, | Case No. 12-cv-9184 |
| Plaintiff, | |
| v. | Judge Robert M. Dow, Jr. |
| | Magistrate Judge Sheila Finnegan |
| CITY OF CHICAGO, et al., | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Michael Saunders, Vincent Thames and Harold Richardson (collectively, "Plaintiffs") bring suit against the City of Chicago ("City") seeking redress for their alleged

wrongful convictions for the 1994 rape and murder of Nina Glover ("Glover"). All three Plaintiffs also name as Defendants Chicago Police Department ("CPD") Detectives Kevin Boudreau, Richard Paladino, James Cassidy, Thomas Coughlin, William Foley, Frank Valadez, and Pat McCafferty, and Sergeant L. Tuldier. Saunders also names as Defendants CPD Youth Officer Charles Bowen (collectively with the CPD Detectives and Sergeant Tuldier, the "Officer Defendants") and Assistant State's Attorney ("ASA") Valentini; and both Saunders and Thames name as a Defendant ASA Johnson (collectively with Valentini, the "ASAs"). Plaintiffs' cases have been consolidated for purposes of discovery and other common issues. See *Richardson*, Case No. 12-cv-9184, Docket Entry [42].[1] The consolidated case is currently before the Court on (1) Plaintiff Richardson's motion [236] and sealed motion [238] for leave to file a First Amended Complaint adding the ASAs to his case; and (2) Plaintiffs' Joint Objections to Magistrate Judge Finnegan's Discovery Order Regarding the Multi-Purpose Tracking System ("MPTS") Database ([266]; *Saunders*, Case No. 12-cv-9158, Docket Entry [261]; *Thames*, Case No. 12-cv-9170, Docket Entry [261]).

For the reasons explained below, Plaintiff Richardson's motion [236] and sealed motion [238] for leave to file a First Amended Complaint in Case No. 12-cv-9184 are granted. Plaintiffs' Joint Objections to Magistrate Judge Finnegan's Discovery Order Regarding the "MPTS" Database ([266]; *Saunders*, Case No. 12-cv-9158, Docket Entry [261]; *Thames*, Case No. 12-cv-9170, Docket Entry [261]) are overruled.

---

[1] For simplicity and to avoid confusion, in the remainder of this opinion the Court cites exclusively to the motions and briefs filed on the docket in *Richardson*, Case No. 12-cv-9184, except where otherwise noted.

**I.  Plaintiff Richardson's Motion [236] and Sealed Motion [238] for Leave to File a First Amended Complaint**

**A.  Background**

**1.  The Proposed First Amended Complaint**

Briefly summarized, Richardson's proposed first amended complaint alleges as follows: On November 7, 1994, Nina Glover's nude body was discovered in a dumpster in Chicago, wrapped in a blood-stained bedsheet. An autopsy revealed that she had been killed by strangulation. Cassidy and other members of the CPD were assigned to investigate the crime. When Cassidy arrived at the crime scene, he obtained identifications from four witnesses, including most relevant here, Johnny Douglas ("Douglas"). Douglas was a convicted felon with a long and violent criminal history, including multiple charges for rape and assault. Douglas had no explanation for being near the crime scene when Glover's body was found. Douglas was an obvious prime suspect in the murder, but Cassidy and the other Officer Defendants failed to check Douglas' background or investigate him further. Douglas went on to commit additional violent crimes against other women, including rape and murder by strangulation.

Four months after Glover was murdered, the Officer Defendants approached a learning-disabled neighborhood teenager, Jerry Fincher ("Fincher") about the crime. According to the proposed amended complaint, through use of coercive interrogation, physical violence, and prolonged detention, the Officer Defendants obtained Fincher's false confession to the Glover murder. Fincher also falsely implicated four other neighborhood teenagers in the murder: Richardson, Thames, Saunders, and Terrill Swift ("Swift"). None of these teenagers were involved in the murder or knew the true perpetrator—who was later discovered through DNA to be Douglas. These four teenagers were chosen by Defendants to be framed for the Glover rape

3

and murder, because of Defendants' belief that they were gang members or somehow affiliated with gangs.

After obtaining Fincher's false confession, the Officer Defendants and ASAs coerced the four boys whom Fincher had named to confess to taking part in Glover's rape and murder. First, through coercion and threats, the Officer Defendants and ASA Johnson obtained a false, recorded confession from Thames, which implicated Richardson, Saunders, Swift, and Fincher. The Officer Defendants then picked up, interrogated, and threatened Swift, and made false promises of leniency if he confessed. Swift eventually falsely implicated himself, Richardson, Fincher, Thames, and Saunders in an oral statement and in a court-reported statement.

The Officer Defendants then arrested Richardson, told him they had caught him in front of the Glover crime scheme, and threatened to kill him. They took him to the police station, handcuffed him to the wall of an interrogation room, interrogated him without a parent or guardian, told him they had evidence linking him to the Glover rape and murder, pressured him to implicate himself in the crime, and made false promises of leniency. "Defendant ASA Johnson was initially involved in securing the false and fabricated statements from [Richardson], before passing the task of attempting secure a statement from [Richardson] to Valentini." [238-1] at 16. After hours of pressure, Richardson eventually gave in and agreed to repeat the false account of the Glover rape and murder that the Officer Defendants had provided to him. In an oral statement, Richardson falsely implicated himself, Thames, Saunders, Swift, and Fincher. However, despite further pressure and false promises of leniency from the Officer Defendants, Richardson refused to sign a written statement documenting him confession, because he knew it was untrue. Finally, the Officer Defendants used threats of physical harm and coercion to obtain

a false written confession from Saunders, in which he also implicated Richardson, Thames, Swift, and Fincher.

Each of the teenagers was charged with first degree murder and aggravated sexual assault. After charges were filed, the Officer Defendants and ASAs continued to coordinate efforts to implicate the five teenagers and to fabricate additional evidence, including fabricating reports describing how Richardson's confession was obtained, strategizing how to conceal their misconduct in interrogating the boys, and sharing a document detailing what the Officer Defendants and the ASAs should say when questioned about the circumstances of the Glover investigation. At a suppression hearing in the criminal case, Johnson "falsely claimed that [Richardson] had confessed to him." [238-1] at 16. Richardson was convicted at a bench trial, without any physical evidence, solely based on his oral confession. He was sentenced to 40 years in prison. Swift, Saunders, and Thames were also convicted following bench trials and each sentenced to between 30 and 40 years in prison. Fincher's confession was deemed to be illegally obtained following a suppression hearing, and all charges against him were dropped.

Following conviction, Richardson and the other Plaintiffs continued to maintain their innocence and seek exoneration. On November 16, 2011, the Circuit Court of Cook County granted Richardson and his co-defendants' joint petition to vacate their convictions. On September 14, 2012, the State of Illinois granted Richardson a certificate of innocence.

### 2. Procedural History

Richardson filed his original complaint against the Officer Defendants and the City on November 1, 2012. See [1]. Richardson alleged Section 1983 claims against the Officer Defendants for violation of his rights under the Fifth Amendment and the Due Process Clause, failure to intervene, conspiracy, and supervisory liability. He also alleged state-law claims

5

against the Officer Defendants for malicious prosecution, intentional infliction of emotional distress, and civil conspiracy. In addition, he alleged a Section 1983 *Monell* policy claim and state-law claims for respondeat superior and indemnification against the City.

Richardson did not name ASAs Valentini and Johnson as Defendants in his original complaint. In contrast, Saunders named both Johnson and Valentini as defendants in his original complaint, which he filed on November 15, 2012. See *Saunders*, Case No. 12-cv-9158, Docket Entry [1]).[2] Thames also named Johnson (but not Valentini) as a defendant in his first amended complaint, which he filed on November 20, 2012. See *Thames*, Case No. 12-cv-9170, Docket Entry [5].

The parties have engaged in extensive discovery since the governing complaints were filed. Fact discovery formally closed on April 22, 2015, but there are still motions pending before Magistrate Judge Finnegan and this Court concerning discovery, and additional discovery yet to be completed. Summary judgment has not yet been briefed.

On May 9, 2016, Richardson received discovery documents from the FBI, including most significantly a report recording an interview between Johnson, FBI Special Agent Moore ("Moore"), and two DOJ attorneys (the "Moore Report"). The interview described in the Moore Report took place months before Richardson filed his lawsuit. Johnson did not mention the interview in written or oral discovery in this litigation, and Richardson was unaware of the

---

[2] Saunders alleged, in part, that "Defendant Officers, working in concert with Defendant ASAs Johnson and Valentini, coerced each juvenile into 'confessing' to taking part in the rape and murder of Ms. Glover." *Saunders,* Case No. 12-cv-9158, Docket Entry [1], at 12. Saunders also alleged: "ASA Johnson was initially involved in [Richardson]'s interrogation, before passing the case off to ASA Valentini. Although [Richardson] never gave a statement to ASA Johnson, Johnson later falsely claimed that [Richardson] had confessed to him. [Richardson] eventually succumbed to Defendants' unlawful pressure by giving an oral admission to ASA Valentini, but, knowing it was false, refused to allow the statement to be reduced to writing. ASA Valentini, ASA Johnson and the other Defendant Officers were all aware that [Richardson]'s confession was the product of coercion and was merely a fabricated version of events that had been fed to him by Defendants, including ASA Johnson and Valentini." *Id*. at 18.

Moore Report until he received it from the FBI earlier this year. In his interview with Moore, Johnson allegedly made damning admissions about the investigation of the Glover rape and homicide and the manner in which the Officer Defendants worked alongside ASAs Johnson and Valentini to procure the confessions that were ultimately the basis for Plaintiffs' wrongful convictions. Johnson's admissions allegedly provided evidence that the ASAs worked alongside the Officer Defendants, during the interrogations and thereafter (for instance, during a suppression hearing), to fabricate and coerce Plaintiffs' confession and ensure that they would hold up in court. Johnson allegedly admitted that Valentini promised Richardson leniency in exchange for a confession, that Johnson falsely claimed not to remember things that troubled him about the Officer Defendants' timelines, and that Valentini agreed to conform his testimony to that of the Officer Defendants.

About two months after receiving the Moore Report, Richardson moved for leave to file an amended complaint to add Johnson and Valentini as defendants to the Section 1983 and state-law claims that he had previously brought against only the Officer Defendants. Moore, Valentini, and the City oppose Richardson's motion on the basis that amendment would be futile as all of Richardson's claims against the ASAs are barred by the relevant statutes of limitation.

B.   **Legal Standard**

A motion for leave to file an amended complaint should "freely" be granted "where justice so requires." Fed. R. Civ. P. 15(a)(2). "This liberal policy of granting amendments is based in part on the belief that decisions on the merits should be made whenever possible, absent countervailing considerations." *Olech v. Vill. of Willowbrook*, 138 F. Supp. 2d 1036, 1040 (N.D. Ill. 2000) (citation omitted). Thus, leave to amend is freely given "'[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the

movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, [or] futility of amendment.'" *Barry Aviation, Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 687 (7th Cir. 2004) (quoting *Foman v. Davis*, 371 U.S. 178 (1962)). There is "[g]ood cause" to file an amended complaint "when it is reasonable that new claims are only recognized after filing an initial complaint." *Luckett v. Conlan*, 561 F. Supp. 2d 970, 976 (N.D. Ill. 2008).

The Court "may refuse to entertain a proposed amendment on futility grounds when the new pleading would not survive a motion to dismiss." *Gandhi v. Sitara Capital Mgmt., LLC*, 721 F.3d 865, 869 (7th Cir. 2013). It should be "*certain* from the face of the complaint that any amendment would be futile or otherwise unwarranted'" before leave to amend is denied. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 519–20 (7th Cir. 2015) (quoting *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 687 (7th Cir. 2004)); see also *Luvert v. Chicago Hous. Auth.*, 142 F. Supp. 3d 701, 706 (N.D. Ill. 2015).

Ultimately, "'[t]he decision to grant or deny a motion to file an amended pleading is a matter purely within the sound discretion of the district court.'" *Soltys v. Costello*, 520 F.3d 737, 743 (7th Cir. 2008) (quoting *Brunt v. Serv. Employees Int'l Union,* 284 F.3d 715, 720 (7th Cir. 2002)).

**C. Analysis**

Richardson argues that, in the interests of justice, his motion for leave to amend should be granted to allow him to add claims against the ASAs. According to Richardson, the Moore Report shows that there is a strong basis for alleging that the ASAs conspired with the Officer Defendants to fabricate and coerce Richardson's confession, in violation of his constitutional

rights and rights under Illinois state law. Richardson asserts that before receiving the Moore Report, he did not know the extent to which the ASAs were involved in these violations. For that reason, and in light of his obligations under Rule 11, Richardson decided not to name the ASAs as defendants in his original complaint. See Fed. R. Civ. P. 11(b)(3). Richardson argues further that the ASAs will not be unduly prejudiced by allowing him to file an amended complaint because both ASAs are already parties to the consolidated lawsuit, and attorneys representing both ASAs already had the opportunity to depose Richardson over his two-day deposition. According to Richardson, allowing him to amend will not delay discovery, since the ASAs have been on notice of the suit and actively participated in discovery in the consolidated cases.

ASA Valentini and the City argue in response that amendment would be futile because Richardson's new claims against the ASAs are barred by either the two-year statute of limitations applicable to Section 1983 claims, or the one-year statute of limitations applicable to Illinois tort claims. Valentini and the City maintain that Richardson's claims accrued before he filed his original complaint more than four years ago, because Plaintiff has "known of Fabio Valentini's identity and role regarding Plaintiff's confession and prosecution since well before the instant case was filed" and there has "never been a misunderstanding as to the role of Fabio Valentini in the memorialization of Plaintiff's confession to the rape and murder of Nina Glover." [271] at 5. Valentini and the City also argue that amendment would cause undue delay because it "would essentially necessitate re-litigating written discovery and a significant number of depositions." [271] at 7. Valentini and the City further argue that Richardson's motion for leave to amend has been brought in bad faith because the Moore Report is hearsay and therefore would be inadmissible at trial.

9

In his separate response, ASA Johnson adds that Richardson's claims against Johnson had accrued by the time he filed his original case because Richardson knew back in 1997 when Johnson testified at the suppression hearing that Johnson had not, as Johnson testified, taken an oral confession from Richardson on March 5, 1995. Johnson also points out that Saunders alleged back in 2012 that Johnson had been involved in eliciting a false confession from Richardson.

After considering the parties arguments and the proposed first amended complaint, the Court concludes that it would be premature to hold that Richardson's proposed claims against Johnson and Valentini are barred by the statute of limitations. The Seventh Circuit has cautioned that "a motion to dismiss based on failure to comply with the statute of limitations should be granted only where 'the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense.'" *Chicago Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613 (7th Cir. 2014) (quoting *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005)). "In other words, the plaintiff must affirmatively plead himself out of court; the complaint must 'plainly reveal . . . that [the] action is untimely under the governing statute of limitations.'" *Id.* (quoting *Lewis*, 411 F.3d at 842).

In this case, the Court cannot say based on the face of the proposed amended complaint that it is "certain . . . that any amendment would be futile" due to operation of the statutes of limitation. *Runnion*, 786 F.3d at 519-20. Generally speaking, the two-year statute of limitations applicable to Illinois personal injury actions applies to Section 1983 claims brought in Illinois, see, e.g., *Gekas v. Vasiliades*, 814 F.3d 890, 894 (7th Cir. 2016), and a one-year statute of limitations applies to state tort claims brought in Illinois, see 745 ILCS 10/8-101. Section 1983 claims accrue—that is, the statute of limitations on such claims begin to run—"when the plaintiff

'knows or should know that his or her constitutional rights have been violated.'" *Gekas*, 814 F.3d at 894 (quoting *Hileman v. Maze,* 367 F.3d 694, 696 (7th Cir. 2004)). Similarly, for Illinois state laws, the "discovery rule" may "postpone[]the beginning of the limitations period to the date when the plaintiff discovers or should have discovered that he has been injured." *Blankenship v. Pushpin Holdings, LLC*, 157 F. Supp. 3d 788, 793 (N.D. Ill. 2016) (internal quotation marks and citation omitted).

The ASAs and the City point to only two places in the amended complaint that supposedly show that the statute of limitations on Richardson's claims had already run when he filed his original complaint in 2012. First, the proposed amended complaint alleges that "Defendant ASA Johnson was initially involved in securing the false and fabricated statements from [Richardson], before passing the task of attempting [to] secure a statement from [Richardson] to Valentini." [238-1] at 16. This allegation is insufficient to demonstrate that Richardson had discovered his claims against the ASAs at the same time he discovered his claims against the Officer Defendants. It does not tell the Court how the ASAs were involved in securing Richardson's confessions or whether they were present for or otherwise knew of the Officer Defendants' use of coercive techniques to obtain the confessions. For instance, this allegation does not rule out the possibility that Johnson's and Valentini's only role was to take down a confession or statement that the Officer Defendants told the ASAs Richardson was ready to provide, and that Johnson and Valentini knew nothing about the Officer Defendants' use of coercive techniques or the falsity of Richardson's eventual oral confession.

The second relevant allegation in the proposed amended complaint is that, when he testified at Richardson's suppression hearing, Johnson "falsely claimed that [Richardson] had confessed to him." [238-1] at 16. This statement does not tell the Court *why* Johnson testified

falsely, or when or if Richardson formed a belief that Johnson lied on the stand. For instance, Johnson might have made a mistake and confused the identities of Richardson and his co-defendants, or Richardson may not have come to believe that Johnson purposely lied on the stand until he received a copy of the Moore Report in 2016. While further factual development may very well provide evidence that Richardson "discovered" the ASAs' involvement before receiving the Moore Report (as suggested by Saunders' original complaint, see *supra* note 2), at this stage the Court is limited to evaluating the face of Richardson's proposed amended complaint. *Chicago Bldg. Design*, 770 F.3d at 613; *Lewis*, 411 F.3d at 842. In short, the Court cannot say based on the face of the proposed amended complaint that Richardson knew or should have known, prior to receipt of the Moore Report, that Johnson and/or Valentini were involved in the Officer Defendants' alleged scheme to obtain a false confession from Richardson, which resulted in his wrongful conviction.[3]

The Court further concludes that the risk of undue prejudice to the ASAs does not outweigh the Court's interest in deciding this case on its merits. See *Olech*, 138 F. Supp. 2d at 1040. Johnson and Valentini are already defendants in the consolidated cases, have been represented by counsel throughout the litigation, and have actively participated in joint discovery. While Valentini and the City argue that allowing amendment would require the parties to engage in substantial additional discovery, they have not provided any factual detail supporting their position. Richardson, by contrast, explains that none of the depositions

---

[3] The ASAs and the City also argue that Richardson's proposed amended complaint does not, under Rule 15(c)(3), "relate back" to the original complaint for purposes of the statute of limitations, because Richardson did not mistakenly identify the wrong Defendants. Fed. R. Civ. Pro. 15(c)(3). The Court's initial impression is that Rule 15(c)(3) does not apply, but the Court need not decide this issue now because Richardson is not relying on this rule to amend his complaint; instead, he relies on the discovery rule and argues that his claims against the ASAs did not accrue, in the first instance, until he received the Moore Report. The Court also finds it unnecessary to determine at this stage whether the equitable tolling doctrine might apply to Richardson's claims against the ASAs.

conducted thus far—except possible the depositions of Richardson's brother and sister—pertained only to Richardson's case, because the guilt or innocence of any one Plaintiff bears on the claims of all remaining Plaintiffs. Richardson has also offered to allow the ASAs to re-depose his brother and sister to ask any additional necessary questions. The Court is confident that the parties can work out any remaining discovery issues prior to summary judgment briefing.

Finally, the Court is not persuaded by the ASAs' and the City's hearsay objections to Richardson's reliance on the Moore Report as a basis for amending his complaint. While the Moore Report may not be admissible at trial—a matter that, Richardson correctly points out, will be subject to motions in limine and depend on the manner in which the case is tried—the late production of the Moore Report nonetheless supports Richardson's position that he only recently discovered his claims against the ASAs and that there is a factual basis for those claims. For these reasons, the Court grants Richardson's motion for leave to file a first amended complaint.

## II. Plaintiffs' Joint Objections to Magistrate Judge Finnegan's Discovery Order Regarding the MPTS Database [266]

### A. Background

As part of the defense in their criminal prosecution, Plaintiffs sought pre-trial DNA testing of vaginal swabs that were recovered from Glover's body. The swabs contained one male DNA profile, which did not match the DNA profile of Plaintiffs or the other teenagers who were accused of Glover's murder. In 2011, post-conviction DNA testing revealed that Douglas' DNA was contained on the vaginal swabs.

In this case, Plaintiffs assert that Defendants ignored and/or suppressed evidence that would have linked Douglas to the Glover murder, and instead coerced and threatened Plaintiffs

into providing false confessions to the murder. In particular, Saunders[4] alleges that Douglas had a lengthy criminal history that "was known to Chicago law enforcement when they encountered him [on the morning Glover's body was found], but] [o]n information and belief, Officer Defendants either failed to run Douglas's background, which would have alerted them to his significant criminal history, or ignored and suppressed what they found." *Saunders*, Case No. 12-cv-9158, Docket Entry [1] at 7-8. After failing to link Douglas to the murder and finding no other leads, Saunders alleges, the Officer Defendants canvased the neighborhood to find vulnerable individuals to further interrogate, manipulate, coerce, and force into confessing, in order to have one less unsolved homicide for the department. *Id.* at 9-10. In his *Brady* claim, Saunders alleges that Defendants "deliberately or recklessly ignored exculpatory evidence of which they were aware, and failed to conduct a constitutionally adequate investigation." *Id.* at 40. In his malicious prosecution claim, Saunders alleges that "the Defendant Officers intentionally withheld from and misrepresented to prosecutors facts that further vitiated probable cause against Plaintiff, . . . and failed to investigate evidence which would have led to the actual perpetrator." *Id.* at 47.

To support their *Brady* and malicious prosecution claims, Plaintiffs seek access to the MPTS database, which the CPD previously used to track crimes against prostitutes. Plaintiffs believe that this database will reveal information that the Officer Defendants learned or could have learned about the Glover murder had they not willfully refused to investigate other suspects. The database was created and used during the 1990s and early 2000s, during a period when many prostitutes in Chicago were raped and murdered, in some cases by serial killers. Then-sergeant John Ridges created the first rudimentary database in 1992 to track prostitute

---

[4] The other Plaintiffs' allegations are substantially similar; for the sake of simplicity the Court cites to Saunders' complaint only.

14

murders (the "Ridges database"). When Ridges was transferred to CPD headquarters in 1997, he received assistance from personnel with more computer experience to transform the Ridges database into the MPTS database.

In January 2015, Plaintiffs served written discovery related to the MPTS database and noticed Ridges for a deposition. After Ridges' deposition, Plaintiffs filed a motion to compel the production of MPTS-related materials. The City maintained that it could not locate a copy of the database and that the database likely no longer existed. On January 8, 2016, Magistrate Judge Finnegan ordered the City to make further efforts to locate documents related to the MPTS database. See generally [167].

Upon further searching, the City was able to locate three copies of the MPTS database. The database contained approximately 300 case records, eight of which (according to the City) contain information relating to the Glover murder or to Douglas. The City agreed to produce the case records pertaining to Glover or Douglas, but resisted producing copies of the full MPTS database on relevance and investigative privilege grounds.[5] On May 12, 2016, Plaintiffs filed a motion to compel the City to produce copies of the entire MPTS database.

On July 25, 2016, Magistrate Judge Finnegan granted in part and denied in part Plaintiffs' motion. See [243]; see also [292-6] (excerpts of transcript from the July 25, 2016 hearing). Following detailed discussion of her ruling on the record, Magistrate Judge Finnegan entered the following minute order:

> The City is to produce a physical copy of the database that has been modified in that it includes only the data for the Glover case and the 7 known cases related to Johnny Douglas. But the City is also to create a copy of the full database (approximately 293 cases) and make it available at a designated location for examination as needed by 1 attorney for each Plaintiff as well as by the Plaintiffs' expert. The designated attorneys and expert shall not copy or download materials

---

[5] According to the City, 39 of the cases contained in the database are still open and unsolved, and therefore protected by investigate privilege, and 5 of the cases are not from the CPD.

from the full database without either the City's agreement or a court order. The parties are to confer and prepare a protective order for the database containing these and other proposed conditions.

Currently before the Court are Plaintiffs' Rule 72(a) objections to Magistrate Judge Finnegan's July 25, 2016 ruling. See ([266]; *Saunders*, Case No. 12-cv-9158, Docket Entry [261]; *Thames*, Case No. 12-cv-9170, Docket Entry [261]); see generally Fed. R. Civ. P. 72(a).

### B. Legal Standard

Magistrate judges have "extremely broad discretion in controlling discovery" when matters are referred to them for discovery supervision. *Weeks v. Samsung Heavy Indus. Co., Ltd.*, 126 F.3d 926, 943 (7th Cir. 1997). Federal Rule of Civil Procedure 72(a) permits parties to object to a magistrate judge's resolution of non-dispositive motions—including discovery motions, see 28 U.S.C. § 636(b)(1)(A)—within fourteen days after being served with the order. This Court "must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a). An order is "clearly erroneous" only when "the district court is left with the definite and firm conviction that a mistake has been made." *Weeks*, 126 F.3d at 943. If "there are two permissible views, the reviewing court should not overturn the decision solely because it would have chosen the other view." *Ball v. Kotter*, 2009 WL 3824709, at *3 (N.D. Ill. Nov. 12, 2009) (internal quotation marks and citation omitted). This "standard of review is consistent with the view that the judge who issued the discovery order at issue is in the best position to determine whether the parties have complied with it." *Id.* (citing *Melendez v. Illinois Bell Tel. Co.*, 79 F.3d 661, 670-71 (7th Cir. 1996)).

### C. Analysis

In their objections to Magistrate Judge Finnegan's ruling, Plaintiffs argue that the full database is relevant to their claims, that Magistrate Judge Finnegan should not have placed any

16

limitations on the production of the full database, and that Plaintiffs' offer to enter into a protective order would alleviate any concerns about ordering the production of the full law enforcement database. See generally [266].

Having considered the parties' arguments, the Court concludes that Magistrate Judge Finnegan's ruling on the MPTS database was eminently reasonable and that Plaintiffs cannot meet the "clear error" standard. Magistrate Judge Finnegan ordered the City to produce copies of the documents from the database which have obvious relevance to this litigation: the case files pertaining to the Glover investigation and Douglas. Magistrate Judge Finnegan's order also allows Plaintiffs access to the *entire* MPTS database and gives them the ability to seek copies of any other documents that Plaintiffs can demonstrate are relevant to their case. Plaintiffs' motion largely glosses over this point. Since the Magistrate Judge's ruling allows Plaintiffs full access to the database, none of their arguments concerning the relevance of documents that they might find on the database even vaguely suggest that the ruling was clearly erroneous.

Nor does Plaintiffs' speculation over what they *might* find when they analyze the full database call into question the accuracy of Magistrate Judge Finnegan's observation that "it is really speculative as to whether [analysis of the full database] is going to have any benefit for you," [292-6] at 20, or, given the speculative nature of Plaintiff's request, her decision to place reasonable limitations on Plaintiffs' search of the full database. For instance, Plaintiffs posit that the database may contain evidence that "Defendants willfully failed to pursue valuable leads— including viable, alternative perpetrators," which would "support[] their malicious prosecution claims by demonstrating bad faith, intentional misconduct, and malice." [266] at 13. To the extent that the MPTS database contains leads pointing to viable alternative suspects, other than Douglas, Plaintiffs will be able to make these connections when they review and run searches of

17

the full database at the City's offices, and to cooperatively resolve with the City how relevant documents will be copied and produced. To the extent that the parties cannot work out these details on their own—which they should be able to do—Magistrate Judge Finnegan's order authorizes Plaintiffs to bring any issues that may arise out of Plaintiffs' further review of the database to her for resolution.

As another example, Plaintiffs argue that their review of the database may show the extent to which officers investigated cases and added information to the database after they were marked 'closed,'" which will "support Plaintiffs' claims that, in 1997 and 1998, as the task force gathered more evidence about Douglas' other crimes, the Defendant Officers could have connected Douglas to Glover," even though the Glover homicide had been marked "closed." [266] at 17. It is unclear from the parties' briefs whether such information is even available from the database; the City maintains, for instance, that "Plaintiffs already know there is no metadata on the MPTS copies that will allow them to determine who made entries and when, or who looked at information or when." [292] at 11. To the extent that Plaintiffs and their experts can glean such information from the database, they are welcome to return to Magistrate Judge Finnegan and present their arguments concerning why additional documents should be produced.

Plaintiffs claim that their review of the full database can effectively be done only in Plaintiffs' offices, "where they and their expert can review the database over the hours of time it is going to take to conduct a full-scale analysis of the 293 cases and their attendant data fields." [266] at 22. However, the Court is not convinced that the limitations placed on Plaintiffs' access to the full MPTS database will inhibit their ability to investigate and prepare their case. Magistrate Judge Finnegan's ruling allows Plaintiffs' attorneys to bring their experts with them to the City's offices to help with searches and analysis. There are no limitations on the amount

18

of time they can spend at the City's computer, and no limitations on the information that the attorney and expert who conduct the searches are allowed to share with other members of their litigation team. Further, Plaintiffs present no evidence that they have even tried to search the database in the City's offices, and encountered any problems. To the extent that they do encounter serious problems that prevent an effective review of the database, Plaintiffs are free to bring their specific concerns to Magistrate Judge Finnegan. With that said, before going to the City's offices, Plaintiffs and their experts should have a plan in mind concerning the data they hope to find and the searches they wish to run, in order to complete their analysis in the most efficient manner possible.

Further, the Court expects, just as Magistrate Judge Finnegan did, see [292-6] at 14, that the parties will be able to resolve any disputes concerning Plaintiffs' need to take screen shots of particular documents in the full MPTS database. There is no indication from the parties briefs that any attempts have been made thus fair to negotiate an agreed order addressing screen shots, copying, and any related issues. The parties and their experts are in the best position to hash out these issues in the first instance, and should seek court intervention only if they come to a true impasse.

Finally, the Court finds nothing erroneous about Magistrate Judge Finnegan's conclusion that ordering the City to produce the entire MPTS database to Plaintiffs could set undesirable precedent. Specifically, Magistrate Judge Finnegan expressed concern with "setting a precedent that any time somebody has an argument that . . . maybe there is a *Brady* claim . . . or maybe you could have pressed the right buttons on your database and come up with a different suspect, that all of a sudden we're producing to parties, a law enforcement database, so they can run their searches." [292-6] at 19. Plaintiffs argue that the MPTS is an old, limited database with less

than 300 cases pertaining directly to prostitute murders, so there can be no "slippery slope" issue. [266] at 20. But the same relevance arguments that Plaintiff makes here would apply to any law enforcement database that is or could be used to find potential links between officers' criminal investigation into a civil rights plaintiff and their other investigations and suspects. In any such case, the plaintiff's attorneys could argue that they need to conduct their own searches of the full law enforcement database to determine what evidence the police overlooked or suppressed. Plaintiffs' agreement to enter into a protective order would do nothing to alleviate this concern. In each case in which a plaintiff seeks access to a law enforcement database, courts also should consider whether the requested access is proportional to the needs of the case. See Fed. R. Civ. P. 26(b)(1). Magistrate Judge Finnegan's measured approach here takes into account that discovery objective as well.

For all of these reasons, the Court concludes that Magistrate Judge Finnegan's July 25, 2016 order was not clearly erroneous or contrary to law and overrules Plaintiffs' objections.

### III. Conclusion

For the foregoing reasons, Plaintiff Richardson's motion [236] and sealed motion [238] for leave to file a First Amended Complaint in Case No. 12-cv-9184 are granted. Plaintiffs' Joint Objections to Magistrate Judge Finnegan's Discovery Order Regarding the "MPTS" Database (*Richardson*, Case No. 12-cv-9184, Docket Entry [266]; *Saunders*, Case No. 12-cv-9158, Docket Entry [261]; *Thames*, Case No. 12-cv-9170, Docket Entry [261]) are overruled.

Dated: January 4, 2017

_____
Robert M. Dow, Jr.
United States District Judge